450

Alfreda TRAHAN, a minor, by her father
and next friend, Nelson Trahan,
et al., Plaintiffs,

v.

**LAFAYETTE PARISH SCHOOL BOARD**
et al., Defendants,

United States of America, Amicus Curiae.

**Civ. A. No. 10903.**

United States District Court,
W. D. Louisiana,
Lafayette Division.

Aug. 13, 1971.

Margrett Ford, New York City, and Marion Overton White, Opelousas, La., for plaintiffs.

Harry J. Kron, Jr., Thibodeaux, La., and Bertrand DeBlanc, Dist. Atty., Fifteenth Judicial District, Lafayette, La., for defendants.

Gary R. Steckler, Lafayette, La., for intervenor, George Dupuis.

Piccione, Piccione & Wooten, Peter C. Piccione and Joseph J. Piccione, Lafayette, La., for intervenors John Montesano and E. M. Christensen.

John Scott, Atty., Education Section, Civil Rights Div., Dept. of Justice, Washington, D. C., for the United States, amicus curiae.

## MEMORANDUM OPINION

PUTNAM, District Judge.

This case, filed on March 5, 1965, is before the court for the fifth time on motion by plaintiffs for further relief, following decision by the Supreme Court of the cases of Swann, et al. v. Charlotte-Mecklenburg Board of Education, et al., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, and Davis, et al. v. Board of School Commissioners of Mobile County, et al., 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577, decided April 20, 1971.

A review of past action by the Board would provide us with nothing more than the familiar pattern of desegregation reported in countless decisions throughout the country since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), through freedom of choice under a two-grade-a-year plan, then under the "model" decree of the Court of Appeals for the Fifth Circuit in United States v. Jefferson County Board of Education, 372 F.2d 836; 380 F.2d 385 (1966–1967), then, following Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), and the decision of Hall v. St. Helena Parish, 417 F.2d 801, 5 Cir. 1969, to a two-step plan based upon a combination of pairing and zoning techniques adopted by the Board following a pretrial conference held in July, 1969, which is the plan under which the system was operated until the end of the 1970–71 term. Phase I of the plan, which successfully terminated the dual school system in the rural areas of Lafayette Parish, was implemented without incident. Because of the good faith demonstrated by this School Board at that time and the facts developed at the pretrial conference mentioned above, in which the HEW team concurred, no appeal was taken from our decree of August 11, 1969, and this parish escaped the holocaust resulting in many other parishes of this and our neighboring states following reversal of the decision of the court in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 5 Cir. 1969, in Carter v. West Feliciana Parish, et al., 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed. 2d 477, which directed that in all cases consolidated therewith student desegregation be accomplished in all schools by February 1, 1970.

During the summer vacation of 1970 no complaint was formally lodged with this court against implementation of Phase II of the Lafayette Plan, which applied to 19 public schools in the city of Lafayette and its immediate environs, attended by 15,932 of the 27,899 public school students in the entire parish. This plan called for closure of Paul Breaux High School, a facility constructed in 1953 and 1954 to accommodate all of the Negro high school students in the parish of Lafayette. We must here note that these students were bussed into Paul Breaux High from the rural areas of the parish, some students travelling as much as twenty miles, round trip, each day. The Paul Breaux campus is located on the north side of

the city in an almost all-Negro residential area.

At the close of the 1970–71 school year, there were 6730 Negro students enrolled in this school system. Of these, 1967 were attending 18 fully integrated rural schools included in Phase I of the plan. For these students, the second year of equal educational opportunity had concluded. See Appendix I and attached map.

The remaining 4763 Negro students, approximately 71% of the system's black children, were enrolled in the city schools encompassed by Phase II of the plan, with 2837 of these, or approximately 60%, attending six of the 19 schools in the city area, namely, Vermilion Elementary, W. A. Lerosen Elementary, Paul Breaux Elementary, St. Antoine Elementary, J. W. James Elementary, and Truman Elementary. As to student population, the precentages ranged from 76.1% black at Lerosen to 95.3% black at Truman. Faculty composition had greatly improved, with only one school, Paul Breaux Elementary, having a predominantly black faculty. See Appendix II and attached map.

Although projections made in 1969 when the plan was approved promised a more equitable distribution of students and complete faculty integration as required by *Singleton,* supra, in the fall of 1970, these projections failed to materialize. The Lafayette Parish School Board, therefore, was maintaining six schools included in Phase II which were identifiable as tailored for black students by reason of student composition and the location of the physical plants in predominantly Negro housing areas as a result of the past era of state-imposed segregation, at the end of the 1970–71 term.

Plaintiffs' motion sought two primary objectives—reopening Paul Breaux High School and institution of a bussing plan to bring about an evenly balanced student population of approximately 75% white and 25% black ratio in each school in the system. In addition, plaintiffs requested employment and assignment of more black female physical education instructors, coaches, and principals in the system.

A hearing was held on this motion on June 28th. of this year. There was no evidence to support the claim that closure of the Paul Breaux High School was racially motivated. On the contrary, this record reflects that it was kept open during 1969–70 because of the hardship its immediate closure would work upon the senior class, many of whom had purchased graduation rings and which had elected its class officers. And, during the 1969 pretrial discussions, as the record thereof demonstrates, it was stated that the Board intended to use the facility for establishment of a vocational educational center for the entire system, because of its central location and accessibility to students from the rural areas. During the 1970–71 school year, moreover, the Board has gone forward with these plans and has contracted work to refurbish a portion of the facility for this purpose at considerable expense.[1] It will be administered on a nondiscriminatory basis, and is generally regarded as an educational advance of considerable significance, not only to Lafayette Parish but as a model for other school districts in this area.

Moreover, the very purpose for which the former high school was built was to perpetuate an invidious discrimination against Negro high school students under the old state-imposed segregated system. Conversion to this use by whites and blacks alike, will, in the opinion of this court, exorcise from the system a constant reminder of past inequities.

Upon the basis of these findings, we deny plaintiffs' motion to reopen Paul Breaux High. The court wishes to point out to the Negro community the further fact that even if Paul Breaux were reopened, it could not, at this time, be

---

1. See resolution of Board and contract let pursuant thereto, filed as Exhibit D6 on June 28, 1971, total cost $336,300.00.

maintained as a black or nearly all-black school.

For lack of any evidence to support the remaining claims advanced by plaintiffs' motions in regard to faculty and staff assignments, these claims are also denied.

We directed, however, that the defendant Board reevaluate the 1969 plan in view of the pattern of segregation still apparent in the racial composition of the six schools mentioned above, in light of the guidelines handed down in *Swann,* supra, *Davis,* supra, and related cases. Plaintiffs were also invited to submit a plan, but did not do so. The HEW plan, formulated by experts from the Office of Equal Educational Opportunities in July of 1969, is basically a pairing plan and is likewise filed in the record.

During the period from June 21, 1971, to July 25, 1971, which the court allowed for this study, the Board and its staff held public meetings attended by representatives of all segments of the public. The court directed the Board that bussing of children should be kept to an absolute minimum. Without attempting to set any inflexible racial ratios, speaking informally and from the bench at the conclusion of the June hearing, we expressed the view that any school with a student population of 60% white and 40% black would most certainly pass constitutional muster.

It was held in *Swann* that great flexibility is allowed to district courts in fashioning equitable remedies. In that case the Court addressed itself to four specific problems in the area of student body composition, which it stated as follows:

"(1) to what extent racial balance or racial quotas may be used as an implement in a remedial order to correct a previously segregated system;

(2) whether every all-Negro and all-white school must be eliminated as an indispensable part of a remedial process of desegregation;

(3) what are the limits, if any, on the rearrangement of school districts and attendance zones, as a remedial measure; and

(4) what are the limits, if any, on the use of transportation facilities to correct state-enforced racial school segregation." (*Swann,* supra, 402 U.S. p. 22, 91 S.Ct. p. 1279)

We shall attempt to capsulate the answers given by the Court to these important questions, within our limited ability to do so, so that the layman reading this opinion may understand them. It was established that the Constitution does not require, and in fact would not permit, a United States court to require as a permanent feature of such a plan any particular degree of racial balance or mixing. Such an order would be reversed. The Court said:

"The constitutional command to desegregate schools does *not* mean that every school in every community must always reflect the racial composition of the school system as a whole." (*Swann,* p. 24, 91 S.Ct. p. 1280)

The Court's approval of the racial balance required by the lower court in that case was predicated upon facts found to exist in the Charlotte-Mecklenburg public school system that are not present here, these facts being (a) the defendant Board had maintained a dual school system at least until 1969, and (b) more important, the finding that the school board had totally defaulted in its obligation to come forward with an acceptable plan of its own, notwithstanding the efforts of the Court to get them to do so. Thus, the use of racial quotas by the district court was approved as a *starting point only,* and found to be within the broad discretionary power of the district court to fashion an equitable remedy under those particular circumstances.

In the case before us, however, the Board has recognized its obligation to dismantle the dual school system in Lafayette and has repeatedly taken affirmative action to achieve this end in the past. The 1969 plan now under attack, when it was proposed (largely through

the efforts of the Board and its president in reconciling opposing factions in the Lafayette community) met the requirements of *Green*, supra, in that it promised realistically to work when implemented. The Board was, and is, in complete good faith.

■ Massive bussing to achieve a racial balance in all schools of this system as is sought by plaintiffs in their motion and by the intervenors hereinafter mentioned is not required in Lafayette Parish and is expressly rejected.

■ In answer to the second question, the Court held that in metropolitan areas minority groups often are found concentrated in one part of a city. Some schools may, therefore, be and remain one-race schools or predominantly of one race; but where this situation is found to exist, the system in question must be subjected to close scrutiny to determine that such schools are not the result of past or continued state-enforced segregation. The burden of showing this factor by a preponderance of the evidence rests upon the School Board. In the present case, the six schools listed above were Negro schools prior to the 1969 plan, and have continued as such despite provisions for majority-to-minority transfers. The decision in Davis v. Board of School Commissioners of Mobile County, supra, a companion case to *Swann*, leaves no doubt in the mind of this Court that until the results of past segregation are eradicated "root and branch", there is no possibility that Phase II of the Lafayette plan would withstand appellate review. This phase of the plan is not a true neighborhood school system as defined in Ellis v. Board of Public Instruction, 5 Cir. 1970, 423 F.2d 203, but on the contrary, was a geographic zone plan, pure and simple. Moreover, majority to minority transferees were not given free transportation to the school of their choice, nor were they granted priority in the allocation of space at that school as *Ellis*, supra, requires.

For these reasons this Court stated orally and now reiterates that it would have been a disservice to the people of Lafayette to approve continuation of the 1969 plan, as it would have inevitably resulted in imposition of radicial changes in the school system after the opening of the 1971–1972 term with consequent disruption of the educational process. The Board and its staff recognized this fact and, to avoid the identical problems that confronted many of our sister parishes in February, 1970, elected to meet the issue and solve it now.

To do this, in confecting the plan proposed, introduced into evidence as Defendant 1 and Defendant 2, on August 6, 1971, the Board utilized a combination of restructuring existing attendance zones, pairing, satellite zoning and gerrymandering to accomplish the transfer of Negro students out of four of these formerly segregated Negro schools and the transfer of white students into these facilities to bring about student desegregation, all within permissible limits as laid down in *Swann*, supra, 402 U.S. pp. 27–28, 91 S.Ct. 1267.

■ It is not to be expected that all of the population will be pleased—and in this case some segments of both white and black communities have registered their protests to the revised plan. This is not, however, a permanent and inflexible organizational structure for Lafayette schools.

"The remedy for * * * segregation may be administratively awkward, inconvenient and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period *when remedial adjustments are being made to eliminate the dual school systems.*" (*Swann*, supra, p. 28, 91 S.Ct. p. 1282. Emphasis supplied.)

When better facilities become available or better methods of operation are devised the Board will be free to adopt them. The process of making remedial adjustments is a continuing one.

■ Addressing itself to the controversial issue of transportation, the Supreme Court has again rejected the propposition that the provisions of Title IV of the Civil Rights Act of 1964, 42 U.S. C.A. § 2000c et seq., prohibits bussing as a means to effectively dismantle a dual school system. This proposition was reurged upon us here by the district attorney, of counsel for the defendant Board, to preserve the Board's rights in event the law should change by Congressional action or Constitutional Amendment. In view of the *Swann* holding, however, the objection is futile. See *Swann*, supra, pp. 16–17, 91 S.Ct. 1267. But, following the suggestion of the Court at the conclusion of the June hearing in this case *that bussing be kept to an absolute minimum, the revised plan does just that.* Mr. Baudoin, Superintendent of Transportation, testified to this effect, and, contrary to some reports emanating from the news media, stated that in his judgment it was possible to implement the plan proposed by the Board with existing facilities, but not without difficulty.

Out of the total of 27,899 students enrolled in this school system during the 1970–71 term, approximately 22,000 students of both races were bussed to school for an average distance of from 1½ to 3 miles.[2] To effect the proposed changes, it is estimated that some of these students, approximately 2200, will be bussed a longer distance, but only a small portion of this number will be children who have never been transported before. Roughly half of these are white, and half are black. These figures are not absolutely accurate, but, in the judgment of the Court, represent as close an estimate as can be made at this time by these experienced school administrators. The problem is not insurmountable and

the majority of the Board, two members dissenting, approved the proposal as workable and submitted it to this Court for approval.

Accordingly, we now hold that the Board's proposal, embodied in Defendants' Exhibits 1 and 2, August 6, 1971, made part hereof by reference, is constitutionally valid and will dismantle the dual school system in this parish insofar as student body composition is concerned, upon its implementation. The racial composition of these schools, under the revised plan as projected on the basis of 1970–71 enrollment figures, is shown on Appendix III (Defendants' Exhibit 3, August 6, 1971), which provides a ready statistical table for comparison with the old plan.

At the final hearing held on August 6, two interventions were allowed by the Court, one filed by the president of the Board, who again urged the Court to reaffirm the 1969 plan, and who further contended that the plan submitted was not the same plan the Board approved at its meeting held July 21, 1971. For reasons previously stated, we cannot approve the 1969 plan. Further, the testimony of Mr. Stanley Babin, spokesman for the Board, and Mr. Nat Gisclair, staff member, established that the plan is the same plan as that adopted by the Board. There was a clerical error in the projected enrollment of students at Myrtle Place Elementary School, which has been corrected. However, the substance of the proposal was not altered. The Court recognizes that it is somewhat unusual to permit an intervention by one of the named defendants in any litigation, and that serious questions of Mr. Dupuis' standing to maintain this petition exist. No objection, however, was urged to the intervention and, because we felt that his actions were dic-

2. Large scale bussing is not new to Lafayette Parish, which operates 177 school busses to accomplish the daily transportation of these 22,000 students, including those who are transported to parochial schools. Statistics given for the Mobile County, Alabama, school system in the

*Davis* case, supra, provide an interesting comparison. There, out of 73,500 students in the school system, only 22,000 (the same number as Lafayette) were provided transportation using 200 school busses during the 1967–68 school year.

tated by a sincere belief that the 1969 plan was best for this school system, we allowed it. The petition is dismissed at intervenor's costs.

The second intervention, filed by Mr. John Montasano and Mr. E. M. Christensen, white residents of the area in which Myrtle Place school is located, representing others similarly situated who have children affected by the pairing of that school with J. W. James Elementary School, adopted the same position as the original plaintiffs in this case, seeking a racial balance of 75% white to 25% black in all schools. In view of *Swann*, supra, and the discussion set out above, this petition is also denied at the cost of intervenors.

At the conclusion of the hearing, plaintiffs objected to that feature of the plan which leaves St. Antoine Elementary and Vermilion Elementary unchanged. Reference to Appendix III will show that these two schools serve grades K–2. St. Antoine had a total enrollment at the close of the 1970–71 school year of 269 children, 87% black and 13% white, while Vermilion, with a total enrollment of 422, was 78.5% black and 21.5% white. The new plan involves minimal bussing of kindergarten, first and second grades, affecting only a few from a satellite zone now assigned to L. J. Montgomery School, carved from the zone formerly served by the all-black Truman Elementary which housed grades K through 8 and which will now serve only kindergarten and grades 4 through 6. Mr. Gisclair testified that bussing these small children away from their immediate neighborhood was kept to an absolute minimum for safety and psychological considerations. He was supported in this by Mr. Gauthe, a well-qualified and experienced expert in the field of education. The racial composition of St. Antoine and Vermilion Elementary is not the result of any racial discrimination, but results from housing patterns in the area. These schools have a stable student population, and do not constitute a substantial constitutional impediment to the revised plan. They are, in fact, within permissible limits of Swann v. Charlotte-Mecklenburg Board, supra. This objection to the system's over-all operation is without merit.

■ We have directed the formation of a biracial committee to assist in the implementation of this plan. The committee will be constituted in due course in keeping with the decisions of the Fifth Circuit Court of Appeals on this subject. We again request the parties to nominate persons having the best interests of the school system and the children it serves at heart. The members finally selected will serve at the pleasure of the Court.

The Court again emphasizes that the Board should continue to study the Lafayette school system and to consider additional means to improve upon the educational structure of its schools. The greatest amount of flexibility permissible under the cases cited herein will be allowed them. The State Department of Education and the Office of Education, Department of Health, Education and Welfare have expressed their willingness to lend the assistance of their experts in the field at any time to further this purpose.

Additionally, the Department of Health, Education and Welfare is requested by this Court to afford the Lafayette Parish School Board all financial assistance possible in the implementation of the minimal additional bussing required by this plan.

A formal decree will be prepared by counsel for the Board and presented for signature. This decree shall incorporate the provisions of *Singleton*, supra, Part I, and in addition, shall provide that the Board take appropriate action to insure that student assignments under the plan the Court now approves be respected, and that no pupil be permitted to attend any school other than the school to which he would be assigned under this plan based upon the actual bona fide residence and domicile of that child's parents, or his tutor, curator or custodian, legally constituted as such by order of a Louisiana District Court.

APPENDIX I

LAFAYETTE PARISH SCHOOL BOARD

SCHOOLS IN PHASE I

| Present Name of School & Grade Structure | Student Body at Close of 1969-70 School Year Phase I | | | | | Enrollment at beginning of 1970-71 School Year | | | | | Student Body at Close of 1970-71 School Year | | | | | 1970-71 Faculty Composition | | | | | Pupil-Teacher Ratio | Capacity | No. Temp. Classrooms |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | N | T | %W | %N | W | N | T | %W | %N | W | N | T | %W | %N | W | N | T | %W | %N | | | |
| Katharine Drexel, K-2 | 196 | 68 | 264 | 74.2 | 25.8 | 216 | 80 | 296 | 73.0 | 27.0 | 234 | 74 | 308 | 76.0 | 24.0 | 11 | 4 | 15 | 73.3 | 26.7 | 20 | 360 | 4 |
| Broussard Elem. 3-6 | 294 | 132 | 426 | 69.0 | 31.0 | 301 | 123 | 424 | 71.0 | 29.0 | 324 | 120 | 444 | 73.0 | 27.0 | 14 | 4 | 18 | 77.8 | 22.2 | 24 | 450 | 0 |
| G. T. Lindon Elem. K-2 | 194 | 50 | 244 | 79.5 | 20.5 | 156 | 66 | 222 | 70.3 | 29.7 | 158 | 65 | 223 | 70.9 | 29.1 | 5 | 5 | 10 | 50.0 | 50.0 | 22 | 270 | 2 |
| Youngsville Elem. 3-8 | 503 | 212 | 715 | 70.3 | 29.7 | 508 | 207 | 715 | 71.0 | 29.0 | 538 | 205 | 743 | 72.4 | 27.6 | 27 | 6½ | 33½ | 80.6 | 19.4 | 21 | 900 | 6 |
| Milton Elem. K-8 | 357 | 30 | 387 | 92.2 | 7.8 | 338 | 24 | 362 | 93.4 | 6.6 | 339 | 27 | 366 | 92.6 | 7.4 | 16 | 4 | 20 | 80.0 | 20.0 | 18 | 510 | 0 |
| Plantation Elem. K-8 | 680 | 24 | 704 | 96.6 | 3.4 | 820 | 31 | 851 | 96.4 | 3.6 | 836 | 26 | 862 | 97.0 | 3.0 | 26 | 7 | 33 | 78.8 | 21.2 | 26 | 900 | 6 |
| Ovey Comeaux High 9-12 | 663 | 105 | 768 | 86.3 | 13.7 | 624 | 140 | 764 | 81.7 | 18.3 | 751 | 144 | 895 | 83.9 | 16.1 | 39 | 9 | 48 | 81.2 | 18.8 | 16 | 990 | 0 |
| Carencro Heights K-2 | 229 | 117 | 346 | 66.2 | 33.8 | 226 | 132 | 358 | 63.1 | 36.9 | 217 | 127 | 344 | 63.1 | 36.9 | 10 | 6 | 16 | 62.5 | 37.5 | 22 | 420 | 7 |
| Carencro Elem. 3-8 | 551 | 319 | 870 | 63.3 | 36.7 | 545 | 336 | 881 | 61.9 | 38.1 | 598 | 326 | 924 | 64.7 | 35.3 | 31 | 10 | 41 | 75.6 | 24.4 | 21 | 1170 | 4 |
| Acadian Elem. K-8 | 718 | 10 | 728 | 98.6 | 1.4 | 806 | 9 | 815 | 98.9 | 1.1 | 794 | 9 | 803 | 98.9 | 1.1 | 25½ | 5½ | 31 | 82.3 | 17.7 | 26 | 960 | 6 |
| Carencro High 9-12 | 339 | 125 | 464 | 73.1 | 26.9 | 624 | 140 | 764 | 81.7 | 18.3 | 609 | 131 | 740 | 82.3 | 17.7 | 32 | 7 | 39 | 82.1 | 17.9 | 20 | 900 | 0 |
| J. Leo Judice El. K-2 | 409 | 53 | 462 | 88.5 | 11.5 | 420 | 55 | 475 | 88.4 | 11.6 | 418 | 69 | 487 | 85.8 | 14.2 | 15 | 5 | 20 | 75.0 | 25.0 | 24 | 480 | 4 |
| Westside Elem. 3-4 | 299 | 57 | 356 | 84.0 | 16.0 | 311 | 45 | 356 | 87.4 | 12.6 | 314 | 52 | 366 | 85.8 | 14.2 | 12 | 4 | 16 | 75.0 | 25.0 | 22 | 450 | 0 |
| Duson Elem. K-6 | 229 | 74 | 303 | 75.6 | 24.4 | 231 | 93 | 324 | 71.3 | 28.7 | 206 | 97 | 303 | 68.0 | 32.0 | 11 | 4 | 15 | 73.3 | 26.7 | 22 | 420 | 6 |
| Scott Elem. 5-8 | 659 | 94 | 753 | 87.5 | 12.5 | 643 | 116 | 759 | 84.7 | 15.3 | 648 | 124 | 772 | 83.9 | 16.1 | 30 | 6 | 36 | 83.3 | 16.7 | 21 | 1000 | 0 |
| Prairie Elem. K-6 | 519 | 10 | 529 | 98.1 | 1.9 | 620 | 11 | 631 | 98.3 | 1.7 | 600 | 12 | 612 | 98.0 | 2.0 | 16 | 5 | 21 | 76.2 | 23.8 | 30 | 840 | 0 |

[A4315]

LAFAYETTE PARISH SCHOOL BOARD
SCHOOLS IN PHASE I

| Present Name of School & Grade Structure | Student Body at Close of 1969-70 School Year Phase I | | | | | Enrollment at beginning of 1970-71 School Year | | | | | Student Body at Close of 1970-71 School Year | | | | | 1970-71 Faculty Composition | | | | | Pupil-Teacher Ratio | Capacity | No.Temp.classrooms |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | N | T | %W | %N | W | N | T | %W | %N | W | N | T | %W | %N | W | N | T | %W | %N | | | |
| Judice Elem. K-8 | 908 | 208 | 1116 | 81.4 | 18.6 | 941 | 228 | 1169 | 80.5 | 19.5 | 932 | 222 | 1154 | 80.8 | 19.2 | 41 | 8 | 49 | 83.7 | 16.3 | 24 | 1140 | 6 |
| Acadiana High 9-12 | 928 | 134 | 1062 | 87.4 | 12.6 | 1427 | 142 | 1569 | 90.9 | 9.1 | 1370 | 137 | 1507 | 90.9 | 9.1 | 58 | 13 | 71 | 81.7 | 18.3 | 22 | 1650 | 9 |

[A4307]

Submitted by:
Nat Gisclaire, Director
Census and Attendance

LAFAYETTE PARISH ELEMENTARY PUBLIC SCHOOL ZONES

1969 - 70 SESSION

| SCHOOLS | GRDS. |
|---|---|
| ZONE 1 | CARENCRO HEIGHTS ELEM. - - - - K-2 |
| | CARENCRO ELEM. - - - - - - 3-12 |
| ZONE 2 | ACADIAN ELEM. - - - - - - - K-8 |
| ZONE 3 | DUSON ELEM. - - - - - - - K-6 |
| ZONE 4 | L. LEO JUDICE ELEM. - - - K-2 |
| | WESTSIDE ELEM. - - - - - - 3-4 |
| | SCOTT ELEM. - - - - - - - 5-8 |
| ZONE 5 | JUDICE ELEM. - - - - - - - K-8 |
| ZONE 6 | PLANTATION ELEM. - - - - - K-7 |
| ZONE 7 | MILTON ELEM. - - - - - - - K-8 |
| ZONE 8 | GREEN T. LINDON ELEM. - - K-2 |
| | YOUNGSVILLE ELEM. - - - - 3-8 |
| ZONE 9 | KATHARINE DREXEL ELEM. - - K-2 |
| | BROUSSARD ELEM. - - - - - 3-6 |

LAFAYETTE PARISH SCHOOL BOARD
CENSUS & ATTENDANCE DEPT.

[A4308]

APPENDIX II

LAFAYETTE PARISH SCHOOL BOARD
SCHOOLS IN PHASE II

| Present Name of School & Grade Structure | Former Name & Grade | 1970-71 Phase II Projected Enrollment | | | 1970-71 Actual Enrollment | | | | | 1970-71 Student Body Close of Year | | | | | 1970-71 Faculty Composition | | | | | Pupil-Teacher Ratio | Capacity | No. Temp. Classrooms |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | W | N | T | W | N | T | %W | %N | W | N | T | %W | %N | W | N | T | %W | %N | | | |
| Vermilion Elem. K-2 | | 108 | 369 | 477 | 103 | 371 | 474 | 21.7 | 78.3 | 95 | 347 | 442 | 21.5 | 78.5 | 11 | 8 | 19 | 57.9 | 42.1 | 25 | 540 | 2 |
| W. A. LeRosen Elem. 3-4 | K-6 | 96 | 327 | 423 | 99 | 298 | 397 | 24.9 | 75.1 | 91 | 290 | 381 | 23.9 | 76.1 | 14 | 5 | 19 | 73.7 | 26.3 | 21 | 540 | 2 |
| Paul Breaux Elem. 5-8 | 3-8 | 222 | 778 | 900 | 144 | 618 | 762 | 18.9 | 81.1 | 119 | 585 | 704 | 16.9 | 83.1 | 17 | 23 | 40 | 42.5 | 57.5 | 19 | 1100 | 0 |
| J. W. Faulk Elem. K-4 | K-6 | 835 | 272 | 1107 | 860 | 227 | 1087 | 79.1 | 20.9 | 840 | 223 | 1063 | 79.0 | 21.0 | 32 | 8 | 40 | 80.0 | 20.0 | 27 | 1140 | 2 |
| Alice Boucher Elem. K-6 | | 720 | 156 | 876 | 720 | 215 | 935 | 77.0 | 23.0 | 738 | 231 | 969 | 76.2 | 23.8 | 33 | 7 | 40 | 82.5 | 17.5 | 23 | 1000 | 4 |
| N. P. Moss Elem. 5-8 | K-8 | 835 | 272 | 1107 | 835 | 245 | 1080 | 77.3 | 22.7 | 846 | 241 | 1087 | 77.8 | 22.2 | 41 | 7 | 48 | 85.4 | 14.6 | 23 | 1100 | 4 |
| Northside High 9-12 | | 1396 | 583 | 1979 | 1016 | 588 | 1604 | 63.3 | 36.7 | 967 | 550 | 1517 | 63.7 | 36.3 | 69 | 11½ | 80½ | 85.7 | 14.3 | 20 | 1600 | 2 |
| St. Antoine Elem. K-2 | | 77 | 226 | 303 | 42 | 249 | 291 | 14.4 | 85.6 | 35 | 234 | 269 | 13.0 | 87.0 | 8 | 4 | 12 | 66.7 | 33.3 | 24 | 360 | 0 |
| J. W. James Elem. 3-6 | | 126 | 302 | 428 | 76 | 317 | 393 | 19.3 | 80.7 | 80 | 315 | 395 | 20.3 | 79.7 | 10 | 6 | 16 | 62.5 | 37.5 | 25 | 540 | 0 |
| S. J. Montgomery El. K-6 | | 982 | 0 | 982 | 883 | 1 | 884 | 99.9 | .1 | 889 | 1 | 890 | 99.9 | .1 | 28 | 7 | 35 | 80.0 | 20.0 | 25 | 1000 | 6 |
| Myrtle Place Elem. K-4 | K-3 | 391 | 52 | 443 | 392 | 60 | 452 | 86.7 | 13.3 | 389 | 54 | 443 | 87.8 | 12.2 | 14 | 4 | 18 | 77.8 | 22.2 | 25 | 540 | 4 |
| Lafayette Elem. 5-8 | 4-8 | 719 | 236 | 955 | 786 | 203 | 989 | 79.5 | 20.5 | 778 | 200 | 978 | 79.6 | 20.4 | 39 | 7 | 46 | 84.8 | 15.2 | 22 | 1100 | 1 |
| Truman Elem. K-2 | | 706 | 83 | 789 | 39 | 917 | 956 | 4.1 | 95.9 | 47 | 951 | 998 | 4.7 | 95.3 | 28 | 16 | 44 | 63.6 | 36.4 | 22 | 1000 | 6 |
| Broadmoor Elem. 3-6 | K-2 | Opened in 1970 | | | 506 | 5 | 511 | 99.0 | 1.0 | 510 | 3 | 513 | 99.4 | .6 | 14 | 4 | 18 | 77.8 | 22.2 | 28 | 540 | 0 |
| Edgar Martin Elem. K-6 | 3-6 | 1260 | 14 | 1274 | 793 | 5 | 798 | 99.4 | .6 | 809 | 3 | 812 | 99.6 | .4 | 27 | 7 | 34 | 79.4 | 20.6 | 23 | 1080 | 2 |
| Woodvale Elem. K-4 | K-3 | 768 | 0 | 768 | 712 | 0 | 712 | 100.0 | 0 | 733 | 0 | 733 | 100.0 | 0 | 21 | 5 | 26 | 80.8 | 19.2 | 27 | 900 | 0 |
| L. J. Alleman Elem. 5-8 | 4-8 | 1022 | 2 | 1024 | 1048 | 4 | 1052 | 99.6 | .4 | 1049 | 4 | 1053 | 99.6 | .4 | 39 | 9 | 48 | 81.2 | 18.8 | 22 | 1080 | 6 |
| F. M. Hamilton Elem. K-8 | | 444 | 13 | 457 | 391 | 25 | 416 | 94.0 | 6.0 | 391 | 27 | 418 | 93.5 | 6.5 | 16 | 3 | 19 | 84.2 | 15.8 | 22 | 450 | 0 |
| Lafayette High 9-12 | | 2048 | 550 | 2598 | 1848 | 604 | 2452 | 75.4 | 24.6 | 1763 | 504 | 2267 | 77.8 | 22.2 | 101 | 13 | 114 | 88.6 | 11.4 | 22 | 2580 | 10 |

[A4309]

**ELEMENTARY SCHOOL ZONES**

**LAFAYETTE PARISH PUBLIC SCHOOLS**

**PHASE II**

**SESSION 1970 - 71**

| ZONE | SCHOOL | GRADES | ZONE | SCHOOL | GRADES |
|---|---|---|---|---|---|
| 1 | BROADMOOR ELEM. | K-2 | 6 | BOUCHER, ALICE ELEM. | K-6 |
| | MARTIN, E. A. ELEM. | 3-6 | | | |
| 2 | WOODVALE ELEM. | K-4 | 7 | TRUMAN ELEM. | K-8 |
| | *ALLEMAN, L. J. ELEM. | 5-8 | 8 | ST. ANTOINE ELEM. | K-2 |
| 3 | HAMILTON, F. M. ELEM. | K-8 | | JAMES, J. W. ELEM. | 3-6 |
| 4 | VERMILION ELEM. | K-2 | 9 | MYRTLE PLACE ELEM. | K-4 |
| | LeROSEN, V. A. ELEM. | 3-4 | | *LAFAYETTE ELEM. | 5-8 |
| | BREAUX, PAUL ELEM. | 5-8 | 10 | MONTGOMERY, S. J. EL. | K-6 |
| 5 | FAULK, J. W. ELEM. | K-4 | 11 | PRAIRIE ELEM. | K-6 |
| | *MOSS, N. P. ELEM. | 5-8 | | | |

\* EXTENDED ZONES FOR GRADES 7 & 8:

ALLEMAN, L. J. ELEM. - - - Zone 1 & 2

MOSS, N. P. ELEM. - - - Zone 5 & 6

LAFAYETTE ELEM. - - - Zone 8, 9 & 10

462

CARENCRO HIGH SCHOOL

NORTHSIDE HIGH SCHOOL

LAFAYETTE HIGH SCHOOL

ACADIANA HIGH SCHOOL

COMEAUX HIGH SCHOOL

**HIGH SCHOOL ZONES**

**LAFAYETTE PARISH PUBLIC SCHOOLS**

**PHASE II**

**SESSION 1970 - 71**

LAFAYETTE PARISH SCHOOL BOARD
HIGH SCHOOL ZONES - 1970-71

| ZONE | SCHOOL | GRADE STRUCTURE |
|------|--------|-----------------|
| 1 | CARENCRO HIGH | 9-12 |
| 2 | ACADIANA HIGH | 9-12 |
| 3 | COMEAUX HIGH | 9-12 |
| 4 | LAFAYETTE HIGH | 9-12 |
| 5 | NORTHSIDE HIGH | 9-12 |

[A4312]

RESIDENTIAL AREAS

White

Negro

[A4315]

LAFAYETTE PARISH SCHOOL BOARD
P. O. DRAWER 2158
LAFAYETTE, LOUISIANA    70501        APPENDIX III

AUGUST 6, 1971

| NAME OF SCHOOL | 1970-71 STUDENT BODY CLOSE OF YEAR | | | | | | 1971-72 ANTICIPATED ENROLLMENT | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GRD. | W | N | TOTAL | %W | %N | GRD. | W | N | TOTAL | %W | %N |
| KATHARINE DREXEL ELEM. | K-2 | 234 | 74 | 308 | 76.0 | 24.0 | K-2 | 202 | 76 | 278 | 72.7 | 27.3 |
| BROUSSARD ELEM. | 3-6 | 324 | 120 | 444 | 73.0 | 27.0 | 3-6 | 346 | 111 | 457 | 75.7 | 24.3 |
| GREEN T. LINDON ELEM. | K-2 | 158 | 65 | 223 | 70.9 | 29.1 | K-2 | 167 | 93 | 260 | 64.2 | 35.8 |
| YOUNGSVILLE ELEM. | 3-8 | 538 | 205 | 743 | 72.4 | 27.6 | 3-8 | 547 | 196 | 743 | 73.6 | 26.4 |
| MILTON ELEM. | K-8 | 339 | 27 | 366 | 92.6 | 7.4 | K-8 | 338 | 28 | 366 | 92.3 | 7.7 |
| PLANTATION ELEM. | K-8 | 836 | 26 | 862 | 97.0 | 3.0 | K-7 | 700 | 120 | 820 | 85.4 | 14.6 |
| OVEY COMEAUX HIGH | 9-12 | 751 | 144 | 895 | 83.9 | 16.1 | 9-12 | 880 | 200 | 1080 | 81.5 | 18.5 |
| CARENCRO HEIGHTS ELEM. | K-2 | 217 | 127 | 344 | 63.1 | 36.9 | K-2 | 250 | 161 | 411 | 60.8 | 39.2 |
| CARENCRO ELEM. | 3-8 | 598 | 326 | 924 | 64.7 | 35.3 | 3-8 | 742 | 391 | 1133 | 65.5 | 34.5 |
| ACADIAN ELEM. | K-8 | 794 | 9 | 803 | 98.9 | 1.1 | K-7 | 736 | 140 | 876 | 84.0 | 16.0 |
| CARENCRO HIGH | 9-12 | 609 | 131 | 740 | 82.3 | 17.7 | 9-12 | 680 | 180 | 860 | 79.1 | 20.9 |
| L. LEO JUDICE ELEM. | K-2 | 418 | 69 | 487 | 85.8 | 14.2 | K-2 | 437 | 85 | 522 | 83.7 | 16.3 |
| WESTSIDE ELEM. | 3-4 | 314 | 52 | 366 | 85.8 | 14.2 | 3-4 | 317 | 68 | 385 | 82.3 | 17.7 |
| DUSON ELEM. | K-6 | 206 | 97 | 303 | 68.0 | 32.0 | K-6 | 211 | 105 | 316 | 66.8 | 33.2 |
| SCOTT ELEM. | 5-8 | 648 | 124 | 772 | 83.9 | 16.1 | 5-8 | 660 | 213 | 873 | 75.6 | 24.4 |
| PRAIRIE ELEM. | K-6 | 600 | 12 | 612 | 98.0 | 2.0 | K-6 | 631 | 145 | 776 | 81.3 | 18.7 |
| JUDICE ELEM. | K-8 | 932 | 222 | 1154 | 80.8 | 19.2 | K-8 | 855 | 236 | 1091 | 78.4 | 21.6 |
| ACADIANA HIGH | 9-12 | 1370 | 137 | 1507 | 90.9 | 9.1 | 9-12 | 1552 | 173 | 1725 | 90.0 | 10.0 |
| VERMILION ELEM. | K-2 | 95 | 347 | 442 | 21.5 | 78.5 | K-2 | 131 | 404 | 535 | 24.5 | 75.5 |
| W. A. LeROSEN ELEM. | 3-4 | 91 | 290 | 381 | 23.9 | 76.1 | 3-4 | 212 | 103 | 315 | 67.3 | 32.7 |
| PAUL BREAUX ELEM. | 5-8 | 119 | 585 | 704 | 16.9 | 83.1 | 8 | 900 | 275 | 1175 | 76.6 | 23.4 |
| J. W. FAULK ELEM. | K-4 | 840 | 223 | 1063 | 79.0 | 21.0 | K-4 | 707 | 245 | 952 | 74.3 | 25.7 |
| ALICE BOUCHER ELEM. | K-6 | 738 | 231 | 969 | 76.2 | 23.8 | K-3 | 466 | 276 | 742 | 62.8 | 37.2 |
| N. P. MOSS ELEM. | 5-8 | 846 | 241 | 1087 | 77.8 | 22.2 | 5-7 | 658 | 328 | 986 | 66.7 | 33.3 |
| NORTHSIDE HIGH | 9-12 | 967 | 550 | 1517 | 63.7 | 36.3 | 9-12 | 1050 | 650 | 1700 | 61.8 | 38.2 |
| ST. ANTOINE ELEM. | K-2 | 35 | 234 | 269 | 13.0 | 87.0 | K-2 | 57 | 272 | 329 | 17.3 | 82.7 |
| J. W. JAMES ELEM. | 3-6 | 80 | 315 | 395 | 20.3 | 79.7 | 5-6 | 222 | 118 | 340 | 65.3 | 34.7 |
| S. J. MONTGOMERY ELEM. | K-6 | 889 | 1 | 890 | 99.9 | .1 | K-6 | 864 | 210 | 1074 | 80.4 | 19.6 |
| MYRTLE PLACE ELEM. | K-4 | 389 | 54 | 443 | 87.8 | 12.2 | K-4 | 385 | 181 | 566 | 68.0 | 32.0 |
| LAFAYETTE ELEM. | 5-8 | 778 | 200 | 978 | 79.6 | 20.4 | 7-8 | 670 | 260 | 930 | 72.0 | 28.0 |
| TRUMAN ELEM. | K-8 | 47 | 951 | 998 | 4.7 | 95.3 | K,4-6 | 352 | 268 | 620 | 56.8 | 43.2 |
| BROADMOOR ELEM. | K-2 | 510 | 3 | 513 | 99.4 | .6 | K-2 | 511 | 3 | 514 | 99.4 | .6 |
| EDGAR MARTIN ELEM. | 3-6 | 809 | 3 | 812 | 99.6 | .4 | 3-6 | 798 | 98 | 896 | 89.1 | 10.9 |
| WOODVALE ELEM. | K-4 | 733 | --- | 733 | 100.0 | ---- | K-4 | 659 | 89 | 748 | 88.1 | 11.9 |
| L. J. ALLEMAN ELEM. | 5-8 | 1049 | 4 | 1053 | 99.6 | .4 | 5-7 | 751 | 268 | 1019 | 73.7 | 26.3 |
| F. M. HAMILTON ELEM. | K-8 | 391 | 27 | 418 | 93.5 | 6.5 | K-7 | 351 | 100 | 451 | 77.8 | 22.2 |
| LAFAYETTE HIGH | 9-12 | 1763 | 504 | 2267 | 77.8 | 22.2 | 9-12 | 1850 | 650 | 2500 | 74.0 | 26.0 |

[A4314]